UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION


JIMMIE LEE FORD, JR.

v.                                              Case No.: 8:11-cv-2761-T-24 EAJ
                                                        8:09-cr-88-T-24 EAJ

UNITED STATES OF AMERICA


## ORDER

    This cause comes before the Court on Petitioner Jimmie Lee Ford Jr.'s motion to vacate, set aside, or correct an allegedly illegal sentence pursuant to 28 U.S.C. § 2255. (Civ. Doc. 8; Cr. Doc. 114). The Government opposes the motion. (Civ. Doc. 15). Petitioner filed a reply. (Civ. Doc. 16). As explained below, the motion is **DENIED**.

    In Mr. Ford's § 2255 motion, Mr. Ford alleges several errors occurred at the pre-trial, trial, and sentencing phases of litigation. Pre-trial, Mr. Ford argues that: 1) his counsel was ineffective for permitting his Speedy Trial rights to be violated, and 2) his counsel was ineffective for not obtaining all discovery. (Civ. Doc. 9, pp. 18-19, 22).

    Mr. Ford alleges that counsel was ineffective at trial for: 1) not challenging the confidential informant's credibility and calling him as a witness, 2) not objecting to faulty chain of custody procedures, 3) not addressing the wetness of the drugs when they were weighed, 4) permitting the jury to hear gang evidence, and 5) not requiring proof of the exact amount of drugs on the verdict form. (Civ. Doc. 9, pp. 13-15, 21-23).

    At sentencing, Mr. Ford alleges that: 1) his counsel was ineffective for not having him sentenced under the Fair Sentencing Act, 2) his counsel was ineffective for not challenging his prior two state court convictions, and 3) his state court convictions were unconstitutional because no intent was required for the convictions. (Civ. Doc. 9, pp. 2-12, 17-18, 23-25).

Finally, Mr. Ford argues that the federal drug statute interferes with state rights. (Civ. Doc. 9, pp. 23-25).

## I.    Background

### Speedy Trial Act Procedural History

On June 16, 2009, Mr. Ford was arraigned on three counts of unlawful distribution of five grams or more of cocaine base. (Cr. Docs. 1, 4). Trial was set for August 3, 2009. (Cr. Doc. 4). At the first status hearing on July 15, 2009, Assistant Federal Defender Adam Allen, standing in for defense counsel Assistant Federal Defender Dionja Dyer, moved for a continuance of the trial, stating that Ms. Dyer only recently received discovery. (Cr. Doc. 11). The Court granted the motion to continue and set the case on the September 2009 trial docket. (Cr. Doc. 11).

At a status conference on August 19, 2009, the parties informed the Court that the case was set for a change of plea hearing on September 1, 2009 before the Magistrate Judge. (Cr. Doc. 16). Ms. Dyer also informed the Court that Mr. Ford had informed her that he had hired another attorney, Bryant Camareno. (Cr. Doc. 16). Ms. Dyer stated that she had not yet confirmed the retention. (Cr. Doc. 16). The case remained on the September 2009 trial calendar. (Cr. Doc. 16).

On August 28, 2009, Ms. Dyer filed a motion to continue the September trial date, stating that Mr. Ford had not, in fact, retained Mr. Camareno. (Cr. Doc. 19, p.3). Ms. Dyer further represented that Mr. Ford no longer wanted to continue with the change of plea hearing until various pre-trial motions were pursued. (Cr. Doc. 19, p.3). Ms. Dyer requested a continuance of the trial date until the October trial term so Mr. Ford could retain the attorney of his choice, so she could file pre-trial motions if she remained as Mr. Ford's attorney, and so another change of plea hearing could be scheduled after the motions if Mr. Ford still wanted to plead guilty. (Cr. Doc. 19, p.4). On August 31, 2009, the Court granted the second defense motion to continue the trial date. (Cr. Doc. 20). Trial was set for the October 2009 trial term. (Cr. Doc. 20).

At the September 16, 2009 status conference, Ms. Dyer informed the Court that Mr. Ford was no longer going to hire Mr. Camareno, Mr. Ford again wanted to plead guilty, and the parties were waiting for a change of plea date from the Magistrate Judge.[1]  (Cr. Doc. 22).  At the change of plea hearing set for September 30, 2009 before Magistrate Judge Elizabeth A. Jenkins, Mr. Ford informed counsel that he no longer wanted to plead guilty and instead wanted to proceed to trial.  (Cr. Doc. 24).

On October 1, 2009, Ms. Dyer filed a Motion for Protection, seeking protection from having the trial the week of October 13, 2009, and asking for a trial date-certain of Monday, October 19, 2009.  (Cr. Doc. 25, p.4).  The Court granted the motion and set the trial for October 19, 2009.  (Cr. Doc. 27).

**Notice of Prior Convictions**

On October 1, 2009, the Government filed an Information and Notice of Prior Convictions.  (Cr. Doc. 26).  The notice informed Mr. Ford that he was eligible for enhanced penalties under 21 U.S.C. § 841(b) of not less than 10 years and not more than life imprisonment, at least eight years of supervised release, and a fine not to exceed $4,000,000 by virtue of Mr. Ford's prior felony drug convictions.[2]  (Cr. Doc. 26, p.1).  The Government provided notice of two prior felony drug convictions for Mr. Ford that occurred in 2002: Possession of Cocaine in case 2002-CF-006330 and Possession of Cocaine in case 2002-CF-

---

[1]     The first change of plea date of September 1, 2009 was cancelled at Mr. Ford's request.  (Civ. Doc. 18).

[2]     21 U.S.C. § 841(b)(1)(B) (effective dates July 27, 2006 - April 14, 2009) provides that in a case involving distribution of 5 grams or more of a mixture or substance containing cocaine base, if a person commits such an offense "after a prior conviction for a felony drug offense becomes final, such person shall be sentenced to a term of imprisonment which may not be less than 10 years and not more than life imprisonment" and a supervised release term of at least eight years will apply.

010463, both in violation of Florida Statute § 893.13 in the Thirteenth Judicial Circuit for Hillsborough County, Florida.[3,4]  (Cr. Doc. 26, p.2).

### Trial Evidence

The Court held a jury trial from October 19, 2009 through October 20, 2009.  (Cr. Docs. 41, 42).  At trial, three Hillsborough County Sheriff's Office Detectives testified that they participated undercover in either two or three drug transactions with Mr. Ford.

### November 19, 2008 Transaction

Detectives Jeffrey Catlin and Israel Hernandez testified that they participated in the November 19, 2008 drug transaction in an undercover capacity.  (Cr. Doc. 78, pp. 152, 154, 239-40).  Detective Catlin drove the undercover vehicle, Detective Hernandez sat in the backseat, and a confidential informant sat in the passenger seat.  (Cr. Doc. 78, pp. 156, 235).  The confidential informant called Mr. Ford to arrange the purchase in the presence of the detectives.  (Cr. Doc. 78, pp. 155, 233).  The confidential informant led the detectives to the Johnson Kenneth Apartments.  (Cr. Doc. 78, pp. 155, 276).  Mr. Ford approached the passenger side window of the undercover vehicle, and the confidential informant introduced the detectives to Mr. Ford. (Cr. Doc. 78, pp. 156, 237).  Mr. Ford handed a package of crack cocaine to Detective Hernandez, and Detective Hernandez handed Mr. Ford $225.  (Cr. Doc. 78, pp. 157, 239-40). Mr. Ford gave $25 of the $225 to the confidential informant.  (Cr. Doc. 78, p.240).  The detectives and confidential informant left the area, and the confidential informant gave Detective Hernandez the $25 that Mr. Ford had given him.  (Cr. Doc. 78, pp.157, 240).

The Government introduced the crack cocaine into evidence as well as an audio recording of the conversation regarding the sale.  (Cr. Doc. 78, pp. 242-43, 245-46).  Both

---

[3]     Florida Statute § 893.13(6)(a) provides that possession of a controlled substance is a felony of the third degree.

[4]     The pre-sentence investigation report for the possession of cocaine convictions listed July 23, 2002 as the date of the guilty pleas, adjudication, and initial sentencing, and November 19, 2002 as the date of probation revocation.  (PSR at 9).

detectives identified Mr. Ford in court as the person who provided the drugs. (Cr. Doc. 78, pp. 158, 247). During the drug transaction, Detective Catlin was four feet away from Mr. Ford and had an unobstructed view of his face. (Cr. Doc. 78, p.157). Detective Hernandez identified a photo of how Mr. Ford looked on November 19, 2008. (Cr. Doc. 78, p.250). A chemist, Richard Horvat, testified that the drug was cocaine base and weighed 5.0812 grams. (Cr. Doc. 78, p.203).

### December 16, 2008 Transaction

Detectives Fernando Fragoso and Israel Hernandez testified that they participated in the December 16, 2008 transaction in an undercover capacity with Mr. Ford. (Cr. Doc. 78, p.172). This time, the detectives did not utilize a confidential informant. Detective Hernandez drove the undercover vehicle, and Detective Fragoso sat in the front passenger seat. (Cr. Doc. 78, pp. 173, 258, 276). Detective Hernandez called Mr. Ford and arranged to meet near Mr. Ford's residence. (Cr. Doc. 78, p.172). The detectives agreed to purchase approximately one ounce of crack cocaine from Mr. Ford and expected to pay between $750 and $900. (Cr. Doc. 78, pp. 256, 276).

Once the undercover detectives arrived at the agreed-upon location, Mr. Ford got into the back seat of the undercover vehicle. (Cr. Doc. 78, pp. 174, 258). Mr. Ford provided the crack cocaine to Detective Hernandez. (Cr. Doc. 78, pp. 174, 258). Detective Fargoso weighed the drugs on a scale by his feet, as was customary in the drug business when purchasing a large quantity. (Cr. Doc. 78, p.259). The crack appeared wet at the time of the sale, as if it had recently been cooked. (Cr. Doc. 78, p.259). The Government offered the drugs into evidence as well as an audio recording of the conversation between the detectives and Mr. Ford at the time of the sale. (Cr. Doc. 78, pp. 262, 264). Detective Fragoso and Detective Hernandez each identified Mr. Ford in court as the person who provided the drugs. (Cr. Doc. 78, pp. 174-75, 265). Chemist Horvat testified that the drug was 26.2 grams of cocaine base. (Cr. Doc. 78, pp.203-04).

**January 14, 2009 Transaction**

Detectives Fragoso and Hernandez testified that they participated in the January 14, 2009 transaction in an undercover capacity with Mr. Ford. (Cr. Doc. 78, pp. 176, 271). Again, the detectives did not utilize a confidential informant. The detectives again arranged to meet Mr. Ford at the same location as in the December 16, 2008 transaction – near Mr. Ford's residence. (Cr. Doc. 78, pp. 176, 272). When they arrived, both detectives exited their vehicle. (Cr. Doc. 78, pp. 176, 273). Mr. Ford gave the crack cocaine to Detective Faragoso in exchange for $240. (Cr. Doc. 78, p.176). The Government offered the drugs and an audio recording of the conversation into evidence. (Cr. Doc. 78, pp. 180-81, 205-06, 210, 273). Detective Hernandez identified Mr. Ford in court as the person who provided the drugs. (Cr. Doc. 78, p. 274). Chemist Horvat testified that the drug was 5.5286 grams of cocaine base. (Cr. Doc. 78, pp. 205-06).

**Defense Evidence**

The defense did not offer any evidence. (Cr. Doc. 78, pp. 55-56). The defense did cross-examine the detectives about the number of drug cases they had worked on since Mr. Ford's transactions, as well as the fact that they knew where Mr. Ford would be seated in the courtroom. (Cr. Doc. 78, pp. 161, 163, 186; Cr. Doc. 78, p.26). The defense further challenged the detectives' recollections of Mr. Ford's distinctive features and emphasized that the confidential informant told the detectives Mr. Ford's name and the confidential informant was working off criminal charges. (Cr. Doc. 78, pp. 165, 167, 187-88; Cr. Doc. 78, pp. 20, 29). The defense further cross-examined Detective Fargoso about not having made an arrest after the December or January transactions. (Cr. Doc. 78, p. 193). The defense cross-examined Detective Hernandez about the fact that the detectives did not use video surveillance and the fact that the address on Mr. Ford's license was different from where the December and January drug deals took place. (Cr. Doc. 79, pp. 14-15, 36).

The defense questioned the chemist about the fact that the chemist did not know what the evidence technician did with the drugs after the chemist analyzed them, and it emphasized that the chemist could have gotten a false-positive in one of the three tests he performed. (Cr. Doc. 78, pp. 219-20). The defense further challenged the chemist for not having had proficiency testing on the infrared spectrophotometer, specifically with respect to cocaine base. (Cr. Doc. 78, pp. 214, 221-223).

**Verdict**

The jury found Mr. Ford guilty of all three counts of distributing cocaine base and specifically found that each transaction involved five grams or more of cocaine base. (Cr. Doc. 78, pp. 103-104).

**Pre-Sentence Report**

The Pre-Sentence Investigative Report (PSR), dated January 14, 2010, listed a number of prior criminal convictions, including the two listed in the Government's previously filed Notice of Prior Convictions: Possession of Cocaine in case number 2002CF6330 and Possession of Cocaine in case number 2002CF10463, both from Hillsborough County, Florida. (PSR at 9-10; Cr. Doc. 26). The PSR specifically stated:

> On October 1, 2009, the United States Attorney's Office filed an information notifying the defendant of the enhanced statutory penalties based upon previous convictions. **The presentence investigation supports the validity of these convictions. Pursuant to the provisions of 21 U.S.C. § 851(b), the presentence report is disclosed to the defendant and counsel to affirm or deny the convictions when filing their written objections to the report.** If the convictions are denied, a copy of the written denial will be forwarded to the United States Attorney's Office per 21 U.S.C. § 851(c).

(PSR at 17). The PSR further listed the enhanced penalties of 10 years to life imprisonment pursuant to 21 U.S.C. § 841(b)(1)(B)(iii). (PSR at 17). The PSR listed the guideline imprisonment range of 130-162 months based on the offense level of 28 and criminal history category of V. (PSR at 17).

The PSR further provided information regarding the crack cocaine to powder cocaine disparity. It stated:

> In this case, the advisory guideline base offense level was determined to be 28; however, a 1:1 ratio of crack cocaine to powder cocaine, would yield a base offense level of 14. There is no adjustment for acceptance of responsibility, thus the total offense level is 14, and the criminal history category is V. For complete parity with cocaine powder and in consideration of a sentence outside the guideline range, the term of imprisonment would be 33-41 months. However, the defendant is subject to a mandatory minimum sentence of 10 years and, therefore, the term of imprisonment would be 120 months.

(PSR at 20).

The Government did not present any objections to the PSR or the applicable guideline range. (PSR Addendum, Jan. 11, 2010). The defense made one objection: "Paragraphs 7-11 (Offense Conduct) - The defendant has indicated that since he went to trial in this matter and is pursuing an appeal, he objects to the facts in the presentence report." (PSR Addendum, Jan. 11, 2010). Paragraphs 7-11 addressed the details of the three drug transactions. The probation office replied:

> The Probation Office obtained the facts from offense reports furnished by the United States Attorney's Office and through an interview with the Assistant United States Attorney assigned to the case. There has not been any information presented that the facts in the presentence report are incorrect. Therefore, the report is correct as written.

(PSR Addendum, Jan. 11, 2010). Mr. Ford did not challenge his prior drug convictions for Possession of Cocaine or the Section 851 enhancement of his sentence. (PSR Addendum, Jan. 11, 2010).

**Sentencing**

On January 21, 2010, the Court held Mr. Ford's sentencing hearing. Mr. Ford confirmed that he had reviewed the PSR with his attorneys and stated that he did not need any additional time to discuss the PSR with his attorneys. (Cr. Doc. 82, p.3). The Court informed Mr. Ford

that there was a mandatory minimum penalty of 10 years' incarceration and stated that his advisory guideline calculation was based on an offense level of 28, and a criminal history category of V, for a range of imprisonment of 130-162 months. (Cr. Doc. 82, p.4).

The Court further discussed the Section 851 notice and explained that the Government was seeking enhanced penalties of 10 years' incarceration to life based on Mr. Ford's 2002 convictions for possession of cocaine from Hillsborough County. (Cr. Doc. 82, p.5). The Court noted that although the date of sentencing was the same for both possession of cocaine convictions, the convictions had separate case numbers. (Cr. Doc. 82, p.5). The Court noted that nothing had been filed contesting the prior convictions and specifically inquired of Mr. Ford's counsel whether Mr. Ford was contesting either of the two prior convictions. (Cr. Doc. 82, p.5). Mr. Ford's counsel replied that Mr. Ford was not contesting the prior convictions. (Cr. Doc. 82, p.5).

When asked by the Court if he wished to say anything, Mr. Ford asked the Court about its jurisdiction. (Cr. Doc. 82, p.8). The Court explained that it had jurisdiction over violations of federal law that occurred in the Middle District of Florida. (Cr. Doc. 82, pp. 8-9). Mr. Ford also asked about the crack/powder disparity, and the Court explained that there was a mandatory minimum sentence of 120 months required in Mr. Ford's case. (Cr. Doc. 82, pp. 15-16). Mr. Ford did not raise any concerns about his prior convictions. The Court inquired whether there was any reason not to proceed with sentencing, and both attorneys said there was no reason not to impose sentence. (Cr. Doc. 82, p.17).

The Court imposed a sentence of 130 months' incarceration, concurrent on each of the three counts of conviction, followed by eight years of supervised release. (Cr. Doc. 82, pp. 17-18).[5]

---

[5]    The defense attorney objected "for the record" to the fact that the sentence would be 33-41 months under a 1:1 crack to powder cocaine ratio and noted that the 120 month mandatory minimum sentence was three times that amount. (Cr. Doc. 82, p.19).

**Post-Sentencing Sentence Reduction**

On December 8, 2011, the Court issued an order stating that Amendment 750 of the U.S. Sentencing Guidelines, retroactive as of November 1, 2011, may have the effect of lowering Mr. Ford's guideline range. (Cr. Doc. 98, p.1). The Court directed the Probation Office to file a supplemental report and for the parties to respond to the report. (Cr. Doc. 98, p.2). Mr. Ford then moved for such a reduction and stated that his sentence should be reduced by ten months. (Cr. Docs. 99, 103). Mr. Ford's counsel filed a response stating that Mr. Ford's sentence should be lowered to 110 months (the low-end of his guideline range) and that the 120 month mandatory minimum sentence should not apply. (Cr. Doc. 109, pp. 18-19). The Government argued that the 120 month mandatory minimum still applied, but the Government did not oppose a reduction of Mr. Ford's sentence to 120 months. (Cr. Doc. 110, pp. 4-5). The Court held that the mandatory minimum sentence of 120 months still applied and reduced Mr. Ford's sentence from 130 months' to 120 months' incarceration. (Cr. Doc. 111, p.2).

**Direct Appeal**

The Federal Public Defender's office, the same office that handled the trial and sentencing, represented Mr. Ford on his direct appeal. See United States v. Ford, 394 F. App'x. 648, 648 (11th Cir. 2010).

Mr. Ford raised only one issue on direct appeal: whether the district court committed legal error based upon the reasonable doubt instruction it gave. See Ford, 394 F. App'x at 649. The Eleventh Circuit affirmed, holding that the reasonable doubt pattern jury instruction the district court gave was one that the Eleventh Circuit had "repeatedly approved." Id.

## II.     Motion to Vacate Sentence

### A.     Procedural Default

As an initial matter, one of Mr. Ford's claims is procedurally defaulted. Mr. Ford argues that the federal prosecution interfered with the State of Florida's right to prosecute cases at the state level. (Civ. Doc. 9, pp. 23-25). Mr. Ford did not raise this argument at the trial level or on

direct appeal. As such, this claim is procedurally defaulted. <u>See</u> <u>Withrow v. Williams</u>, 507 U.S. 680, 721 (1993) (holding that if a claim is not raised on direct review, it is procedurally defaulted and will not be reviewed under habeas absent equitable considerations, such as actual innocence or cause and prejudice). Mr. Ford has not alleged or shown actual innocence or cause and prejudice relating to this claim.[6]

The remainder of Mr. Ford's claims allege ineffective assistance of counsel before trial, at trial, or at sentencing. The Court will address each of these arguments grouped in the approximate order of their alleged occurrence.

**B.      Ineffective Assistance of Counsel**

In <u>Strickland v. Washington</u>, 466 U.S. 668, 687 (1984), the Supreme Court created a two-part test for determining whether a defendant received ineffective assistance of counsel. First, a defendant must demonstrate that his counsel's performance was deficient, which requires a "showing that counsel made errors so serious that counsel was not functioning as the counsel guaranteed . . . by the Sixth Amendment." <u>Id.</u> Second, a defendant must demonstrate that the defective performance prejudiced the defense, meaning counsel's errors were so serious as to deprive the defendant of a fair trial, a trial the result of which is reliable. <u>Id.</u> The defendant must establish both prongs, and if he makes an insufficient showing as to one, the Court need not address the other prong in order to find that counsel was not ineffective. <u>Id.</u> at 697.

In order to succeed on an ineffective assistance of counsel claim, "the defendant must show that counsel's representation fell below an objective standard of reasonableness." <u>Id.</u> at 688. Judicial scrutiny of counsel's performance muse be "highly deferential," as it is "all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence." <u>Id.</u> at 689. A court "must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." <u>Id.</u> at 690. The

_____

[6] Contrary to the Government's suggestion, the Court does not find Mr. Ford's claims about the Fair Sentencing Act defaulted as the Fair Sentencing Act became effective on August 1, 2010 and Mr. Ford's direct appeal was decided on August 27, 2010. Mr. Ford would not have briefed the issue in his direct appeal as Mr. Ford's initial brief was filed on April 27, 2010.

court must determine whether, "in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." Id. The movant carries a heavy burden, as reviewing courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. at 689. The defendant must overcome the "presumption that, under the circumstances, the challenged action might be considered sound trial strategy." Id. at 689 (internal quotation marks omitted).

Simply showing that counsel erred or his performance was deficient is not sufficient. Id. at 691. Instead, the defects in counsel's performance must be prejudicial to the defense. Id. at 692. Therefore, under the second prong, a movant must establish that there is a reasonable probability that the results would have been different but for counsel's deficient performance. Id. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id.

### 1. Ineffective Assistance of Counsel Before Trial

Mr. Ford argues that his counsel was ineffective pre-trial by: 1) failing to enforce his Speedy Trial rights, and 2) failing to obtain all discovery of transcripts. (Civ. Doc. 9, pp. 18-19, 22).

### a. Speedy Trial Act

As an initial matter, Mr. Ford's trial was initially set for August 3, 2009. (Cr. Doc. 4). Mr. Ford's trial was continued to September 2009 at his counsel's request in order to have more time to review discovery. (Cr. Doc. 11). Mr. Ford's counsel requested a second continuance of the trial date to October 2009 because Mr. Ford wanted a new attorney and had changed his mind about pleading guilty. (Cr. Doc. 19, p.4).

In fact, Mr. Ford's attorney, Ms. Dyer, informed the Court that Mr. Ford had an initial change of plea hearing set for September 1, 2009 before the Magistrate Judge. (Cr. Doc. 16). Ms. Dyer, in her motion to continue, informed the Court on August 28, 2009, that Mr. Ford no longer wanted to plead guilty. (Cr. Doc. 19, p.4). Ms. Dyer then informed the Court on September 16, 2009, that Mr. Ford again wanted to plead guilty. (Cr. Doc. 22). At the change of

plea hearing set for September 30, 2009 before the Magistrate Judge, Mr. Ford again changed his mind about pleading guilty and requested a trial. (Cr. Doc. 24). Mr. Ford's trial began less than three weeks later, on October 19, 2009.

Under these circumstances, when Mr. Ford vacillated multiple times about whether to proceed to trial and was uncertain about whether he wanted Ms. Dyer to remain as counsel, counsel's conduct in requesting continuances based upon the wishes of Mr. Ford and her need to review discovery did not fall below an objective standard of reasonableness. See Strickland, 466 U.S at 688. As such, Mr. Ford's claim of ineffective assistance of counsel based on a Speedy Trial Act violation is without merit.

### b.     Transcript Discovery

Mr. Ford's claim that his attorney failed to obtain "discovery transcripts" is conclusory, unfounded, and unexplained. Mr. Ford devoted one sentence to this claim in his memorandum of law. (Civ. Doc. 9, p.25). Mr. Ford does not explain what transcripts his counsel should have obtained. In fact, audio recordings of all three charged drug transactions were admitted into evidence. (Cr. Doc. 78, pp. 180-81, 245-46, 264). Mr. Ford can hardly claim that he was unaware of the evidence that would be introduced regarding the three charged offenses. Mr. Ford has failed to show any deficiency by counsel or prejudice caused thereby. As such, Mr. Ford's claim of ineffective assistance of counsel based on failure to obtain discovery is without merit.

### 2.     Ineffective Assistance of Counsel at Trial

Mr. Ford argues that his counsel was ineffective at trial for: 1) not challenging the confidential informant's credibility and calling the informant to testify, 2) not challenging the chain of custody of the drugs, 3) not disputing the weight of the drugs given that they were wet, 4) permitting evidence that Mr. Ford was a gang member to come in at trial, and 5) not requiring the verdict form to state the exact amount of drugs. (Civ. Doc. 9, pp. 13-15, 21-23).

### a.     **Confidential Informant**

With regard to Mr. Ford's claim that counsel should have called the confidential informant to testify and should have challenged his credibility, counsel's performance in this regard did not fall below an objective standard of reasonableness. There is nothing in the record to suggest that the informant's testimony would have been beneficial to Mr. Ford's case. In fact, given that counsel chose to challenge the identifications of Mr. Ford made by the undercover detectives, the informant may well have served to undercut that argument, by pointing out Mr. Ford in court as the person with whom he and the detectives interacted.[7] (Cr. Doc. 78, pp. 162-64, 185-88; Cr. Doc. 79, pp. 13, 18-26). Thus, any decision not to call the informant was a reasonable sound trial strategy. See Strickland, 466 U.S at 689.

Furthermore, contrary to Mr. Ford's assertion, counsel did challenge the informant's credibility by cross-examining two detectives about the fact that the informant was working off charges. (Cr. Doc. 78, p.167-68; Cr. Doc. 79, pp. 27-28).

Moreover, Mr. Ford cannot show prejudice. Only one of the three charged drug transactions involved the confidential informant. In that first transaction in which the confidential informant participated, the two undercover detectives witnessed the informant's phone call with Mr. Ford and participated directly with Mr. Ford in the actual drug sale. The fact that the confidential informant was not called as a witness does not create a reasonable probability that the results would have been different in the trial. See Strickland, 466 U.S. at 694. Accordingly, Mr. Ford's claim of ineffective assistance of counsel based on the failure to call the confidential informant at trial is without merit.

---

[7]     Defense counsel asked whether Detective Catlin was able to observe Mr. Ford's tattoo during the November 2008 transaction and whether Detective Catlin knew where Mr. Ford would be sitting in court. (Cr. Doc. 78, pp. 162-64). Defense counsel asked Detective Fragoso if he knew where Mr. Ford would be sitting in court and to expound on Mr. Ford's features. (Cr. Doc. 78, pp. 186-87). When Detective Fragoso cited medium complexion, with a thin wide nose, a round head, and dreadlocks, defense counsel inquired whether Detective Fragoso had come across other black males with similar features and Detective Fragoso stated he had. (Cr. Doc. 78, pp. 187-88). Defense counsel asked Detective Hernandez why he checked plaited hair on his report and emphasized that his description included only plaited hair, facial hair, normal and gold-capped teeth, and no visible tattoos. (Cr. Doc. 79, pp. 18-20).

### b.   <u>Chain of Custody</u>

With regard to the chain of custody of the drugs, Mr. Ford's counsel did challenge the chain of custody procedures, contrary to Mr. Ford's claim that counsel was ineffective in this regard.  (Civ. Doc. 9, p.22).  Counsel cross-examined the chemist and showed that the chemist had not been in possession of the samples from the time he completed his testing until trial.  (Civ. Doc. 78, pp.215-16).  Counsel confirmed that the chemist did not know what the evidence technician did with the samples before the chemist obtained them from the evidence vault or after the chemist turned them back in to the evidence vault.  (Cr. Doc. 78, p.217).  Counsel objected to the admission of each of the drug exhibits based on inadequate foundation and authentication.  (Cr. Doc. 78, pp. 243-44, 262).

Counsel argued that Detective Hernandez put the drug exhibit from the November 2008 transaction into the evidence room but had not seen it since.  (Cr. Doc. 78, pp. 243-45).  Counsel challenged the admission of the drug exhibit from the January 2009 transaction based on chain of custody when the Government attempted to admit the exhibit through Detective Fragoso.  (Cr. Doc. 78, pp. 178-79).  Counsel renewed the objections regarding chain of custody with respect to the December 2008 transaction drug exhibit with Detective Hernandez. (Cr. Doc. 78, pp. 262).[8] Counsel cannot be ineffective for failure to object to the chain of custody of the drugs, when in fact counsel raised multiple objections regarding chain of custody at trial.

### c.   <u>Weight of Drugs</u>

Mr. Ford argues that his counsel was ineffective for failing to object to the drugs having been weighed when they were wet.  (Civ. Doc. 9, p.25).  At trial, there was testimony that one of the three drug exhibits, Exhibit 3, was wet when it was sold to the undercover detectives.  (Cr. Doc. 78, pp. 259-260).  Detective Hernandez testified that for the December 2008 deal, they had agreed to purchase an ounce, or 28 grams from Mr. Ford, and the crack that Mr. Ford gave to the detectives was "very wet."  (Cr. Doc. 78, p.259).  Detective Hernandez explained that when

---

[8]     The drug exhibits from the November 2008 and December 2008 transactions were admitted over objection.  (Cr. Doc. 78, pp. 244, 262).  The drug exhibit from the January 2009 transaction was admitted into evidence prior to the chemist testifying about it.  (Cr. Doc. 78, pp. 208-10).

crack is "freshly cooked," the crack will still have a wet texture and if the crack is packaged and does not "sit long enough" or "if they take it straight from where they made it and put it into the bag, the bag then holds the moisture and the condensation. So when you weigh it, it's going to weigh out to more until it dries." (Cr. Doc. 78, p.260).

When Detective Hernandez reviewed drug Exhibit 3 at trial, he explained that the drugs "stayed moist." (Cr. Doc. 78, p.261). Detective Hernandez surmised that "somewhere in the testing process or whatever [the bag] began to leak. And what you see is part of the tape seal from the [Florida Department of Law Enforcement] bleeding off from the - - from the moisture that was left on the drugs." (Cr. Doc. 78, p.262). Detective Hernandez testified that other than the bleeding of the tape, Exhibit 3 appeared to be in the same or substantially same condition as when he sealed it. (Cr. Doc. 78, p.262). Defense counsel did not cross-examine Detective Hernandez about the wetness of the drugs in Exhibit 3. (Cr. Doc. 79, pp. 10-37).

The chemist testified that the weight of Exhibit 3 without the packaging was 26.2 grams. (Cr. Doc. 78, pp. 203-04). Defense counsel did not cross examine the chemist about the wetness of the drugs. (Cr. Doc. 78, pp. 211-226).

The Government does not address this argument in their opposition. (Civ. Doc. 15).

The record is not clear as to how wet Exhibit 3 was at the time it was weighed by the chemist, or how wet the drugs were when introduced at trial. Although there is some indication that the wetness of the drugs may have caused the drugs to weigh more than when dry, counsel's performance relating to this issue still cannot be characterized as deficient.

When the chemist weighed the drugs, his reading was 26.2 grams. Given that Mr. Ford was charged with distribution of five grams or more of cocaine base with respect to the December 2008 transaction, the likelihood that the drugs would have weighed less than five grams when completely dry is very low. Given this record, it cannot be said that counsel's performance was deficient. If counsel had asked the chemist how much the moisture in the bag might have affected the measurement, it is unlikely that the chemist would have said his measurement of the actual drug amount was off by more than 21.2 grams, the difference that

would be required to take the drug amount below the charged five grams of cocaine base.[9] Accordingly, the Court concludes that Mr. Ford's claim of ineffective assistance of counsel for failing to object to the weight of the drugs is without merit.

### d.    Gang Evidence

Mr. Ford alleges that his counsel was ineffective for "allowing the government to mislead the jury into believing that the Petitioner was a gang member, when in fact the petitioner had absolutely no gang affiliation at all."  (Civ. Doc. 9, pp. 24-25).  Mr. Ford cites no additional support in his memorandum.

As an initial matter, defense counsel did raise this concern with the Court to ensure that Mr. Ford's gang affiliation would not be discussed at trial.  Prior to the start of trial, Mr. Tanenbaum stated:

| | |
|---|---|
| MR. TANENBAUM: | And perhaps a third prong of the same concern that I was just raising is suggestions again through testimony that Mr. Ford is in a gang. |
| | It's not relevant, and it is prejudicial or could be prejudicial to Mr. Ford.  And I raise that concern as well and ask for some sort of limitation on that type of testimony. |
| | And along the same lines – and I guess we'll address it when we get to the charge conference – in the Indictment even at the end where there's the signature of the Assistant U.S. Attorneys, it[] lists one of the chiefs of organized crime in there.  And that also may be prejudicial.  And we'd ask for that to be cleansed as well. |
| THE COURT: | Okay.  Ms. Hale, I'm not asking you about the Indictment.  I'm asking you about the gang. |
| MS. HALE: | Your Honor, I've specifically instructed my law enforcement officers not to mention anything about the defendant's gang affiliation. |

(Cr. Doc. 78, pp. 11-12).

---

[9]    Although the drug quantity amount still affected the guideline calculation, Mr. Ford was still subject to a 120 month mandatory-minimum sentence, the sentence he ultimately received.

During the trial, there were three limited references to gang activity, and Mr. Ford was never implicated as a participant in that activity. (Cr. Doc. 78, pp. 153, 156-57, 236-37). First, when asked where he worked, Detective Jeffery Catlin stated that he worked in the "gang enforcement section" of the Sheriff's office. (Cr. Doc. 78, p. 153). Next, Detective Catlin described that when they pulled into the Johnson Kenneth Apartments to meet Mr. Ford for the November 2008 transaction, "there was probably about eight to ten males standing in the entrance of the apartment complex wearing red clothing. Some of them didn't have shirts on, some of them did have shirts on. Some of them had bandanas hanging from their pockets or around their heads." (Cr. Doc. 78, p.156). Detective Catlin continued to explain that "at some point" Mr. Ford approached their car, and they engaged in the transaction. (Cr. Doc. 78, p. 156-57).

Detective Hernandez similarly mentioned the group of people in his testimony regarding the November 2008 transaction as he discussed safety concerns. (Cr. Doc. 78, pp. 236-37). Detective Hernandez indicated that Mr. Ford came from an upstairs location, a different location than the group in the middle of the street. (Cr. Doc. 78, pp. 236-37). Detective Hernandez explained:

A.    As we drove in, we observed several males standing on the – what would have been the south side of the parking lot. I was – I was advising Detective Catlin that they would possibly be gang members because of the attire that they had on, the neighborhood we were in.

They started to step out towards the street basically to investigate us in the same way we were investigating them. We pulled slowly through the parking lot, parked in the southwest corner of the parking lot, and awaited Mr. Hood's arrival – I mean Mr. Ford's arrival.

Q.    Did it appear – did it appear that the situation could possibly be dangerous?

A.    Absolutely.

Q.    Why?

A.    For one, the area that we were in is a high crime area. It was just myself and Detective Catlin because most of these investigations if you have too many vehicles that pull into an area that are unrecognized, right away they start thinking

it's the police.  And that would potentially mess up the deal and put us in a – in a bad predicament.

And because of the amount of potential gang members that are standing in the middle of the parking lot, in order to exit that parking lot from where we were parked, if they had come onto the road and attempted to stop us or even backed a car out of a parking spot, it would have made for a very, very bad situation.

Q.      What happened once the person that you knew to be Hood came downstairs?

A.      The gentleman approached the vehicle on the passenger side, leaned over and put his face in the passenger window, greeted the source.  The source then did like a brief intro – introduction of Detective Catlin and myself.  And we began negotiation for the crack cocaine, ma'am.

(Cr. Doc. 78, pp. 236-37).  Although Detective Catlin and Detective Hernandez described the scene at the apartment complex from a safety standpoint, they never stated that Mr. Ford came from the group of potential gang members who were standing in the street.  Rather, Mr. Ford came "downstairs," presumably from one of the apartments. (Cr. Doc. 78, p. 237).  Moreover, the two subsequent drug transactions in December 2008 and January 2009 did not take place at that apartment complex, further limiting Mr. Ford's ties to the location where the November 2008 transaction occurred.

Given the remoteness of the references of gang activity to Mr. Ford, defense counsel was not deficient in failing to object to these references.  Defense counsel had already put the Court on notice and obtained assurances from the prosecutor that Mr. Ford would not be directly implicated in any gang affiliation, and he was not so implicated.  (Cr. Doc. 78, pp. 11-12).  Moreover, these limited references to other people in one of the three transactions did not prejudice Mr. Ford such that the outcome of the proceedings would likely have been different absent the references.  See Strickland, 466 U.S. at 694.

### e.      Verdict Form

Mr. Ford alleges his counsel was ineffective for not requesting to have the verdict form state the exact amount of drugs, rather than a jury finding of "5 grams or more."  (Civ. Doc. 9, p.21).

This claim is without merit because the drug quantity is not an element of the offense unless it is used to increase the defendant's sentence beyond the applicable maximum penalty for the smallest detectable quantity.  See United States v. Clay, 376 F.3d 1296, 1301 (11th Cir. 2004).  The quantity of drugs that would have increased the statutory maximum penalty for Mr. Ford based on the version of 21 U.S.C. § 841 in effect at the time of Mr. Ford's trial and sentencing was either 50 grams or more of cocaine base, which yielded a mandatory minimum sentence of 20 years and a statutory maximum sentence of life, or 5 grams or more of cocaine base, which yielded a mandatory minimum sentence of 10 years to life for someone with a prior felony drug offense.  See 21 U.S.C. §§ 841(b)(1)(A)(iii) and (b)(1)(B)(iii) (effective July 27, 2006 to April 14, 2009).  The jury did find that Mr. Ford dealt five grams or more of cocaine base for each count, thereby specifying the statutory maximum that applied to Mr. Ford.  As such, counsel was not deficient for not objecting to the verdict form, as any such objection would have been meritless.

### 3. **Ineffective Assistance of Counsel at Sentencing**

Mr. Ford claims that counsel was ineffective at sentencing because: 1) he was not sentenced under the Fair Sentencing Act, 2) his counsel should have objected to the two prior state convictions as the basis for a section 851 sentencing enhancement, and 3) there was no intent required for his state court convictions, and as a result, they are unconstitutional on their face.  (Civ. Doc. 9, pp. 2-12, 17-18, 20-21, 23-25).

### a. **Fair Sentencing Act**

Mr. Ford claims that he stands convicted of a non-existent crime, because the Fair Sentencing Act changed the amount of cocaine base necessary to trigger the mandatory minimum sentences.  (Civ. Doc. 9, pp. 10-11).  Mr. Ford has received the benefit of the retroactive U.S.S.G. Amendment 750.  Before Mr. Ford filed his § 2255 motion on January 13, 2012, this Court issued an order on December 8, 2011 for briefing regarding the retroactivity of Amendment 750 to the U.S.S.G.  (Cr. Doc. 98).  Following that briefing, on February 17, 2012, this Court reduced Mr. Ford's sentence from 130 months' incarceration to 120 months'

incarceration based upon the new guidelines applicable after the retroactive crack amendment. (Cr. Doc. 111, p.3).

To the extent that Mr. Ford argues that he should not be subject to the statutory mandatory minimum sentence based upon 21 U.S.C. § 841 in effect at the time of sentencing, that claim is without merit. (Civ. Doc. 9, pp. 10-11). The Eleventh Circuit has held that a district court does not have authority to depart from a statutory mandatory minimum sentence for a defendant sentenced before the Fair Sentencing Act absent a substantial assistance motion or safety valve eligibility. See United States v. Gomes, 621 F.3d 1343, 1345-46 (11th Cir. 2010), cert. denied, 131 S. Ct. 1833 (April 4, 2011).

Mr. Ford does not benefit from the recent decision in Dorsey v. United States, 132 S. Ct. 2321 (2012), holding that the Fair Sentencing Act's more lenient penalty provisions apply to offenders who committed crack cocaine crimes before August 3, 2010, but were not sentenced until after August 3, 2010, the date the Fair Sentencing Act took effect. Id. at 2321. Mr. Ford committed his crime and was sentenced before the Fair Sentencing Act took effect. Mr. Ford was sentenced on January 21, 2010. (Cr. Doc. 55). Accordingly, Mr. Ford's claim of ineffective assistance of counsel based on the Fair Sentencing Act is without merit.

**b.**       **Section 851 Enhancement**

Mr. Ford argues that his prior convictions from state court should not serve as the basis for his mandatory minimum 10 year sentence and that his counsel was ineffective for not objecting to the enhancement. (Civ. Doc. 9, pp. 9-12). First, the convictions that formed the basis of the § 851 notice were from 2002, more than five years before the Government filed the Notice of Prior Convictions in 2009. (Cr. Doc. 26). Given their age, defense counsel would have been precluded from challenging the validity of the prior convictions based upon the statute of limitations provision in 21 U.S.C. § 851(e). Section 851(e) states that, "No person who stands convicted of an offense under this part may challenge the validity of any prior conviction alleged under this section which occurred more than five years before the date of the information alleging such prior conviction." See 21 U.S.C. § 851(e); see also United States v. Weaver, 905

F.2d 1466, 1482 (11th Cir. 1990) (holding that challenge to validity of prior convictions was barred under § 851(e) because the convictions occurred more than five years before the date the information was filed).  As such, counsel was not ineffective for failing to challenge the convictions.

Moreover, there is no indication in the record that these convictions would have been invalid.  The Pre-Sentence report confirmed the convictions that the Government filed in its § 851 notice.  The defense attorney specifically stated that Mr. Ford did not challenge the convictions, and Mr. Ford, when given an opportunity to address the Court, did not raise any concerns about the prior convictions, although he asked about other topics, such as jurisdiction and the crack/powder guidelines.  (Cr. Doc. 82, pp. 8-9, 15-16).

Although Mr. Ford alleges in his § 2255 motion that he pled to a lesser offense, he offers no support for this proposition and does not even identify what lesser offense he supposedly pled to.  (Civ. Doc. 9, p.14).  Given this record, defense counsel cannot be considered to have been deficient at sentencing relating to the § 851 issue.

### c.      Constitutionality of State Convictions

With respect to Mr. Ford's argument that there was no intent required for his state court convictions and that they are unconstitutional on their face, the constitutionality of Florida Statute § 893.13 is currently pending before the Florida Supreme Court.  See State of Florida v. Luke Jarrod Adkins, SC 11-1878 (Fla. Sup. Ct.).

Petitioner would need to succeed in vacating his state conviction prior to filing a § 2255 motion on that ground.  See Stewart v. United States, 646 F.3d 856, 864 (11th Cir. 2011) ("[T]he time for challenging a federal statute based on a faulty state conviction is only after that conviction has been vacated."); see also Harris v. United States, 2012 WL 1631744, at *2 (M.D. Fla. May 8, 2012).[10]  Therefore, Mr. Ford's constitutionality argument fails.

---

[10]      Another Middle District of Florida opinion, United States v. Bunton, 2011 WL 5080307, at *1 (M.D. Fla. Oct. 26, 2011), held that Florida Statute § 893.13 is not facially unconstitutional, contrary to the holding in Shelton v. Secretary, Department of Corrections, 802 F. Supp. 2d 1289 (M.D. Fla. 2011), the case Mr. Ford relied upon.

**III.**     <u>**Conclusion**</u>

Accordingly, it is ORDERED AND ADJUDGED that Petitioner's § 2255 motion is **DENIED**. (Civ. Doc. 8; Cr. Doc. 114). The Clerk is directed to enter judgment against Petitioner in the civil case and then to close that case.

<u>**CERTIFICATE OF APPEALABILITY AND**</u>

<u>**LEAVE TO APPEAL IN FORMA PAUPERIS DENIED**</u>

IT IS FURTHERED ORDERED that Petitioner is not entitled to a certificate of appealability. A prisoner seeking a motion to vacate has no absolute entitlement to appeal a district court's denial of his motion. 28 U.S.C. § 2253(c)(1). Rather, a district court must first issue a certificate of appealability ("COA"). <u>Id.</u> "A [COA] may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." <u>Id.</u> at § 2253(c)(2). To make such a showing, Petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," <u>Tennard v. Dretke</u>, 542 U.S. 274, 282 (2004) (quoting <u>Slack v. McDaniel</u> 529 U.S. 473, 484 (2000)), or that "the issues presented were 'adequate to deserve encouragement to proceed further,'" <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 335-36 (2003) (quoting <u>Barefoot v. Estelle</u>, 463 U.S. 880, 893 n. 4 (1983)). Petitioner has not made the requisite showing in these circumstances. Finally, because Petitioner is not entitled to a certificate of appealability, he is not entitled to appeal <u>in</u> <u>forma</u> <u>pauperis</u>.

**DONE AND ORDERED** at Tampa, Florida, this 9th day of July, 2012.

SUSAN C. BUCKLEW
United States District Judge

Copies to:
Counsel of Record
*Pro Se* Defendant